COMMONWEALTH LIFE INSURANCE COMPANY, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 49710, 60786, 70304, 74407.   Promulgated December 14, 1934.

*D. V. Hunter, Esq.*, for the petitioner.
*H. D. Thomas, Esq.*, for the respondent.

### OPINION.

MURDOCK: The deficiencies determined by the Commissioner and the docket numbers of the various proceedings are shown below:

| Docket No. | Year | Deficiency |
|---|---|---|
| 49710 | 1928 | $362.72 |
| 60786 | 1929 | 1,888.27 |
| 70304 | 1930 | 2,615.50 |
| 74407 | 1931 | 2,592.85 |

The evidence consists of a stipulation of facts.

The petitioner occupied all of the space in an office building which it owned. It did not include in its gross income any amount representing the rental value of the space which it occupied in this building, but it nevertheless claimed certain deductions for depreciation, expenses, and taxes in connection with this building. It contended originally that section 203 (b) of the act, which requires the rental value of the space occupied to be included in gross income, was unconstitutional. But the Supreme Court has held, since the present case was submitted, that this provision is constitutional. *Commissioner* v. *Independent Life Insurance Co.*, 292 U. S. 371. Consequently the deductions cannot be allowed unless the rental value is included in gross income. The statute is so worded that an insurance company which occupies all of the space in a building and consequently receives no rents for space occupied by others, will not derive any benefit under the provisions of section 203 (a) (6) and (7) when read in connection with subdivision (b). *Commissioner* v. *Independent Life Insurance Co.*, *supra.* The Supreme Court held, in *Rockford Life Insurance Co.* v. *Commissioner*, 292 U. S. 382, also decided since this proceeding was submitted to the Board, that depreciation on furniture and fixtures used in the underwriting department of a life insurance company is not deductible. That decision disposes of one of the issues raised in this case.

Another issue raised is whether, in computing a deduction of 4 percent of the mean of the reserve funds required by law and held at the beginning and end of the year,[1] the petitioner is entitled to include in its reserve funds the amount of its obligations incurred on account of matured and unsurrendered coupons attached to certain of its policies.

The petitioner was incorporated in Kentucky and conducted its business in Kentucky. It was a life insurance company within the meaning of sections 201, 202, and 203 of the Revenue Act of 1928. It wrote a type of insurance policy which had coupons attached. These coupons matured regularly at certain dates during the life of the policy. Each coupon was a promise on the part of the petitioner to pay a certain sum of money to the insured on the due date of the coupon. The insured could surrender a matured coupon in part payment of the premium due on his insurance or he could leave the

---

[1] Sec. 203. (a) *General rule.*—In the case of a life insurance company the term "net income" means the gross income less—

  \*       \*       \*       \*       \*       \*       \*

  (2) RESERVE FUNDS.—An amount equal to the excess, if any, over the deduction specified in paragraph (1) of this subsection, of 4 per centum of the mean of the reserve funds required by law and held at the beginning and end of the taxable year. \* \* \*

amount due with the company as a deposit. The amounts left on deposit bore interest and could be withdrawn, together with the interest, at any time. The amount due on matured coupons and accumulated interest was payable to the beneficiary in the event of the death of the insured. The holder of a coupon policy could also elect in writing within one year after the date of the policy to take the benefits of a special provision set forth in the policy, under which the coupons would be canceled and the date accelerated upon which the policy would become fully paid up. The facts in regard to the reserves were stipulated as follows:

7. The Company was required by the Commissioner of Insurance of the Commonwealth of Kentucky to keep on deposit with him securities sufficient in value to cover the liability of the Company on its outstanding policies, including the liability for said matured and unsurrendered coupons, less the amount of outstanding loans to policyholders on security of the policies. In the years 1928, 1929, 1930 and 1931 the values of the securities so deposited were less than the net values of the policies as reported to the Insurance Commissioner which net values, as reported, included the liabilities for said matured and unsurrendered coupons. However, the Company had other assets consisting of premium notes and cash, of a value in excess of the amounts by which the deposits with the Insurance Commissioner were less than the aforesaid net values of the policies. The difference between the values of securities deposited with the Insurance Commissioner and the net values of the policies in each of the years were greater than the liabilities on account of the matured and unsurrendered coupons.

8. During the years 1928, 1929, 1930 and 1931, the Company's liability on account of matured and unsurrendered coupons attached to the above-described policies were in the amounts set forth below:

| Year | January 1 | December 31 |
|---|---|---|
| 1928 | $82,575.00 | $84,271.00 |
| 1929 | 84,271.00 | 95,235.00 |
| 1930 | 95,235.00 | 105,404.49 |
| 1931 | 105,404.49 | 112,972.00 |

The total reserves reported by the Company in its Federal Income Tax Return for the years 1928, 1929, 1930 and 1931 were as follows:

| Year | Reserves Reported as of January 1 | Reserves Reported as of December 31 |
|---|---|---|
| 1928 | $7,568,075.06 | $8,622,779.49 |
| 1929 | 8,622,779.49 | 9,745,659.62 |
| 1930 | 9,745,659.62 | 10,755,991.21 |
| 1931 | 10,755,991.21 | 11,636,755.11 |

The Company reported the foregoing amounts to the Insurance Commissioner of Kentucky upon forms prescribed by the National Convention of Insurance Commissioners and listed the amounts relating to coupons under "Liabilities, surplus, and other funds" on a line which is designated "Dividends left with the Company to accumulate at interest, and accrued interest thereon".

9. The Company in its income tax returns for the taxable years in question included the above amounts relating to coupons as a part of its reserves in arriving at the claimed deduction of 4% of the mean of its reserves. The re-

spondent in determining the deficiencies in controversy eliminated the aforesaid amounts and by reason thereof made the following additions to income reported:

| Year | Additions to Income |
|------|--------------------:|
| 1928 | $3, 337. 12 |
| 1929 | 3, 590. 12 |
| 1930 | 4, 012. 79 |
| 1931 | 4, 367. 53 |

The words " reserve funds " as used in section 203 (a) (2) of the Revenue Act of 1928 do not refer to general assets of a corporation nor to assets which merely render a corporation solvent. They refer to something which is set aside or reserved as a fund for some particular purpose. *McCoach* v. *Insurance Co. of North America*, 244 U. S. 585; *Maryland Casualty Co.* v. *United States*, 251 U. S. 342; *United States* v. *Boston Insurance Co.*, 269 U. S. 197; *New York Life Insurance Co.* v. *Edwards*, 271 U. S. 109. State officials sometimes designate certain funds as " reserve funds " and sometimes require that certain funds be maintained for certain purposes. But all such funds are not necessarily included within the meaning of the phrase " reserve funds required by law " contained in section 203 (a) (2) of the Revenue Act of 1928. *McCoach* v. *Insurance Co. of North America, supra; United States* v. *Boston Insurance Co., supra; New York Life Insurance Co.* v. *Edwards, supra.*

The petitioner, in order to show what reserve funds were required by law, has called our attention to section 648–a (1) and section 653 of Carroll's Kentucky Statutes. The provisions of section 648–a (1) may be summarized for the purpose of this case, as requiring that every domestic life insurance company shall deposit with the state treasurer, for the security and benefit of its policyholders, an amount which shall be not less than the amount of the net cash value of each policy in force, ascertained " as now required by law." We are unable to hold that this statute requires any deposit on account of the matured and unsurrendered coupons involved in the present case. These coupons could not be used to purchase additional insurance nor to accelerate the maturity of any policy. The net cash value of the policies in force would not depend upon or include the value of matured and unsurrendered coupons outstanding. The former depends upon the probable life of the insured and is ascertained under the laws of Kentucky by the use of certain " mortality " or " experience " tables. The latter is quite different, being for a definite, fixed amount. The material provisions of section 653 are as follows:

When the actual funds of any life insurance company doing business in this commonwealth are not of a net cash value equal to its liabilities * * * it shall be the duty of the Insurance Commissioner to give notice to such company and its agents to discontinue issuing new policies within this commonwealth until such time as its funds have become equal to its liabilities * * *. Any

office or agent, who, after such notice has been given, issues a new policy from and on behalf of such company, before its funds have become equal to its liabilities as aforesaid, shall forfeit for each offence not exceeding $1,000.

This is a solvency requirement rather than the kind of a reserve requirement referred to in the revenue act. No other provision of the statutes of Kentucky has been called to our attention as having any application in this case and, therefore, we are unable to say what reserve, if any, the petitioner was required by law to maintain in connection with its liability or obligation in regard to matured and unsurrendered coupons.

Furthermore, the stipulation does not show that the petitioner actually held at the beginning and end of the years in question any amount as a reserve to cover its obligations in connection with matured and unsurrendered coupons. The statements of paragraph 7 of the stipulation are contradictory. In the first sentence of that paragraph it is stated that the commissioner of insurance required the petitioner to keep on deposit with him securities sufficient in value to cover the liability of the petitioner on its outstanding policies, including the liability for matured and unsurrendered coupons, less loans secured by policies. But in the next sentence it is stipulated that the values of the securities actually deposited were less than the net values of the policies, including the liabilities for matured and unsurrendered coupons. The next sentence states that the company had, however, other assets consisting of premium notes and cash more than sufficient to make up the difference. The petitioner argues that these " other assets consisting of premium notes and cash " are part of a reserve required by law and held by the petitioner. We are unable to so hold. The Commissioner draws attention to the substance of the last sentence of paragraph 7 of the stipulation to show that there were no securities deposited with the insurance commissioner to cover any part of the liability of the petitioner on account of matured and unsurrendered coupons. There is no statement in the stipulation to show that any reserve was set apart on the petitioner's books to cover its liability on account of matured and unsurrendered coupons.

Thus the petitioner has failed to show that reserves to cover its liability on account of matured and unsurrendered coupons were required by law or that it held, at the beginning and end of the years in question, any reserve to cover its liability on account of matured and unsurrendered coupons. The Board has held in some cases that reserves required by law and held at the beginning and end of the taxable year to cover liability on account of matured and unsurrendered coupons are to be included in the computation of the deduction of 4 percent of the mean and these decisions have been affirmed

by three Circuit Courts of Appeal. See *Commissioner* v. *Standard Life Insurance Co.*, 47 Fed. (2d) 218; *Commissioner* v. *Western Union Life Insurance Co.*, 61 Fed. (2d) 207; *Commissioner* v. *Great American Life Insurance Co.*, 70 Fed. (2d) 133. *Contra*, decisions of the Court of Claims in *Massachusetts Mutual Life Insurance Co.* v. *United States*, 56 Fed. (2d) 897, and *Continental Assurance Co.* v. *United States*, 8 Fed. Supp. 474. However, the question decided in those cases is not reached in this case. Furthermore the coupons in this case are materially different from the coupons involved in the above line of cases, which could be used to purchase additional insurance or to accelerate the maturity of a policy.

The petitioner, in its brief, incorrectly states that the Board in a memorandum opinion in *Inter-Southern Life Insurance Co.*, Docket No. 24966, " construed the above sections of the Kentucky Statutes .as requiring reserves to be maintained to cover obligations on account of matured coupons identical in all material respects with those in the case at bar." A reference to the stipulation in that case will show that the Board was merely repeating the stipulation in respect to the requirements of the statute.

The final question for decision is whether or not the petitioner is entitled to deduct as " investment expenses " under section 203 (a) (5) the amount paid in each year to attorneys in connection with the foreclosure of mortgages. The petitioner, in each of the taxable years, acquired title to certain real estate through foreclosure upon mortgages which were in default. The company invested a very large part of its funds through mortgage loans on real estate. Its income from rentals on real estate was a very small part of its gross income. If the attorney fees paid in connection with the foreclosures were included in the petitioner's investment expenses, the total in each year would be less than one fourth of 1 percent of the book value of the mean of the invested assets held at the beginning and end of the year. The petitioner deducted on its income tax returns amounts representing the expenditures for attorney fees, but the Commissioner disallowed these deductions.

Section 203 (a) (5) provides that " net income " means the gross income less—

(5) INVESTMENT EXPENSES.—Investment expenses paid during the taxable year: *Provided*, That if any general expenses are in part assigned to or included in the investment expenses, the total deduction under this paragraph shall not exceed one-fourth of 1 per centum of the book value of the mean of the invested assets held at the beginning and end of the taxable year.

Congress did not define the phrase " investment expenses." The questions of what is a capital expenditure and of what is an expense have frequently arisen and have been discussed both from the

standpoint of proper accounting and from the standpoint of the revenue acts. Many items have been extremely difficult to classify and perhaps some fall neither in the class of expenses nor in the class of capital expenditures. *Holeproof Hosiery Co.*, 11 B. T. A. 547, 555, 556; *Julia Stow Lovejoy*, 18 B. T. A. 1179; *Sigmund Spitzer*, 23 B. T. A. 776; *Commissioner* v. *Field*, 42 Fed. (2d) 820, reversing 15 B. T. A. 718. The language of this provision differs materially from the language of section 23(a), relating to the deduction of ordinary and necessary expenses of taxpayers computing their income under the general provisions of the statute, and decisions under 23(a) and its predecessors are not controlling here. However, they may be helpful in so far as they deal with the common word "expenses." Attorney fees were allowed as ordinary and necessary expenses, even though they were paid in connection with the acquisition of a capital asset, in *E. S. Briant, Administrator*, 6 B. T. A. 651. Cf. *Samuel D. Leidesdorf*, 26 B. T. A. 881; *L. B. Reakirt*, 29 B. T. A. 1296. However, the *Briant* case seems to be somewhat out of line with the weight of authorities, for more frequently attorney fees have not been allowed as expenses but have been treated for tax purposes as if they were a part of the cost of the capital asset acquired. *Stephens Fuel Co.*, 13 B. T. A. 666; *Columbia Theatre Co.*, 3 B. T. A. 622; *First National Bank of St. Louis*, 3 B. T. A. 807; *Emerson Electric Manufacturing Co.*, 3 B. T. A. 932; *Charles P. Hewes*, 2 B. T. A. 1279; *Laemmle* v. *Eisner*, 275 Fed. 504. Cf. *S. & L. Building Corporation*, 19 B. T. A. 788 (reversed on other grounds); *Spinks Realty Co.*, 21 B. T. A. 674; affd., 62 Fed. (2d) 860; certiorari denied, 290 U. S. 636; *Central Bank Block Association*, 19 B. T. A. 1183; affd., 57 Fed. (2d) 5; *Horn & Hardart Baking Co.*, 20 B. T. A. 486. Occasionally an allocation between capital and expenses has been required. *Frederick McLean Bugher et al., Executors*, 9 B. T. A. 1155. Cf. *Peaslee-Gaulbert Co.*, 14 B. T. A. 769.

The legislative history of section 203 (a) (5) and other special provisions of the act relating to insurance companies may afford some justification for an argument that the phrase "investment expenses" was enacted by Congress with the belief that it had some special significance in a uniform method of accounting employed by insurance companies and it therefore should be interpreted as including all of those items which, under that method of accounting, would be recorded as investment expenses. However, the decision of that question must await another case, since the present record contains no evidence whatever of accounting methods, not even evidence of how the expenditures in question were treated on the petitioner's books. It may be that the phrase "investment expenses"

has no special significance in the accounting methods of insurance companies. If the phrase was intended to have the meaning which the two words, as ordinarily used, would imply, then the word " expenses " would not include the expenditures in question. Such expenditures, if made by a taxpayer other than an insurance company, would not be considered expenses under section 23 (a), but would be treated as a part of the cost of the capital asset acquired. *Firemen's Insurance Co.*, 30 B. T. A. 1004; *Odorono Co.*, 26 B. T. A. 1355; *Charles J. Livingood, Executor*, 25 B. T. A. 585; *I. N. Burman*, 23 B. T. A. 639; *Murphy Oil Co.*, 15 B. T. A. 1195; affirmed on this point, 55 Fed. (2d) 17; *Marjorie Post Hutton*, 12 B. T. A. 265; affd., 39 Fed. (2d) 459; *C. M. Nusbaum*, 10 B. T. A. 664; *Seletha O. Thompson*, 9 B. T. A. 1342; *Brawner* v. *Commissioner*, 63 Fed. (2d) 129, affirming 19 B. T. A. 192. Did Congress intend to treat them as expenses when made by another taxpayer? Cf. *Volunteer State Life Insurance Co.*, 27 B. T. A. 1149, where commissions on sales of properties acquired through foreclosure were not considered investment expenses. It does not appear in this case that the attorney fees were expenses within the meaning of the act. Consequently, we can not say that the Commissioner erred in holding that they were not deductible for the years in question as investment expenses.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

SMITH and MCMAHON dissent on the fifth point.